**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DISTRICT**

| | | |
|---|---|---|
| **EDWARD ROGERS** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 12-cv-3134** |
| | ) | |
| **v.** | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **CAROLYN W. COLVIN,**[1] | ) | |
| **Commissioner of Social Security** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Edward Rogers, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"). Mr. Rogers asks the court to reverse and remand the Commissioner's decision.

**I.    PROCEDURAL HISTORY**

Mr. Rogers applied for DIB on September 22, 2009, alleging that he became disabled on October 1, 2008, due to lower back pain.  His application was denied initially on December 1, 2009 (R. 83), and upon reconsideration on March 30, 2010. (R. 99).  Mr. Rogers continued pursuit of his claim by filing a timely request for hearing on April 26, 2010.  (R. 106-109).

An administrative law judge ("ALJ") convened a hearing on October 22, 2010, at which Mr. Rogers, represented by counsel, appeared, and testified. (R. 46-70).  In addition, Julie Bose testified as a vocational expert. (R. 46,70).  On December 6, 2010, the ALJ issued a decision, finding that Mr. Rogers was not disabled because he does not have an impairment or

---

[1] **Error! Main Document Only.**Pursuant to Federal Rules of Civil Procedure 25(d), we have substituted Carolyn W. Colvin for Michael J. Astrue as the appellee.

combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, that he was capable of sustaining competitive work consistent with his residual functional capacity, and that he was capable of performing the past relevant work of his most recent work history. (R. 11–23). This became the final decision of the Commissioner when the Appeals Council denied Mr. Rogers' request for review of the decision on February 28, 2012. (R. 1–6). *See* 20 C.F.R. §§ 404.955; 404.981. Mr. Rogers has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c).

## II. THE EVIDENCE

### A. The Vocational Evidence

Mr. Rogers was born on September 21, 1972, and was 38 years old on the date the ALJ issued his decision. (R. 51). He is single, with one child and lives with his daughter and her mother. (R. 50-51). Mr. Rogers says he quit his job at Taco Bell in the third quarter of 2009 to accept employment at McDonald's, which then fired him because he was not doing his job because, he says, of his back pain. (R. 52, 68-69). His total income from these two positions was approximately $1,100. (R. 52, 160). His previous positions include janitor, porter, detailer, and van driver. (R. 22). Except for his brief employment in the third quarter of 2009, Mr. Rogers has not worked since October 2008. (R. 52-53).

### B. The Medical Evidence

While Mr. Rogers' medical record provides substantial information documenting a heart attack and diabetes treatments, the amount concerning his principal complaint, low back pain, is slight and intermittent. Mr. Rogers provided documentation of his treatment from Will County Health Center from December 14, 2007, through June 15, 2009 (R. 257-270). The eight visits

over this 18-month period indicate various follow up treatment for Mr. Rogers for his diabetes and a heart attack suffered in June 2008. *Id.* A report on February 17, 2009 described Mr. Rogers as "obese" while an April 7, 2008 report noted that he was "fit for work." (R. 261, 265). While Mr. Rogers was on medications for hypertension and diabetes, he responded well to treatment with only one drug interaction problem in January 2010, requiring a switch from Paxil to Prozac. (R. 20, 316).

On June 30, 2009, Mr. Rogers had an ultrasound performed by Dr. Mohammad Shafi, M.D. of a cyst on his kidney. (R. 294). Dr. Shafi diagnosed the growth as a benign cyst, approximately 2.0 cm in length, and another lesion of 2.0 cm by 3.5 cm on his adrenal gland. (R. 295). Dr. Shafi noted normal renal functions and recommended no further medical intervention except performance of another scan to follow up one year later. *Id.*

The evidence relating to Mr. Rogers' claims of low back pain consists of a referral from his physician in July 2009 followed by two visits to an orthopedic surgeon six months apart. (R. 298, 301-303, 352). The first occurred on August 24, 2009 at Northwestern Memorial Hospital. (R. 301, 364). The report states that Mr. Rogers had been complaining of low back pain for two months. (R. 302). A CT scan revealed a failure formation of the L4 vertebrae with a central failure formation. *Id.* No evidence of instability was found at this level, but some evidence of disk narrowing was possible at the levels above and below. *Id.*

The report characterizes Mr. Rogers as "in no acute distress," with motor strength testing of 5/5 throughout his bilateral lower and upper extremity. *Id.* He had normal sensation and gait, and could walk heel and toe without difficulty. *Id.* He had a negative straight leg raise in the sitting and supine positions. *Id.* Dr. Hsu recommended physical therapy of at least 6-8 weeks

with emphasis on core building. *Id.* He did not feel the vertebral failure was a cause of Mr. Rogers' claimed back pain and did not recommend surgery. *Id.*

Over the next five months, Mr. Rogers visited his primary physician, Dr. Chowdry, seven times. (R. 357-363). On four occasions, Mr. Rogers complained of low back or low back and shoulder pain. *Id.* On his November 9, 2009 visit, the report indicates he was prescribed Toradol overnight, and diagnosed with a lumbar strain. (R. 359). It was also indicated that Mr. Rogers was walking okay. *Id.*

On November 30, 2009, Dr. Marion Panepinto, M.D. performed a Physical Residual Functional Capacity ("RFC") Assessment on Mr. Rogers. (R. 311). Dr. Panepinto determined that while Mr. Rogers had an MDI and joint narrowing of the spine, the *"[physical examination] shows [claimant's] limitations were not limited to the extent alleged."* (R. 309)(Emphasis added). Thus, Dr. Panepinto concluded that Mr. Rogers' statement regarding his limitations only "partially credible." *Id.*

On January 27, 2010, Mr. Rogers returned to Northwestern for a follow up visit. (R. 352). The report indicates Mr. Rogers had undergone four weeks of physical therapy with no appreciable benefit for his low back pain. *Id.* Dr. Hsu again characterized the injury as "likely muscular in nature," and his examination noted no significant changes since the prior visit in August 2009. *Id.* He believed Mr. Rogers' pain was caused by either facet arthropathy or a lumbar strain and recommended a bilateral facet joint injection for treatment. *Id.* Dr. Hsu did not feel Mr. Rogers was a good surgical candidate due to the nature of his complaints, nor did he feel there was any danger with lifting restrictions. *Id.*

As for Mr. Rogers' depression, the record indicates he first sought treatment in December 2007 and continued through April 2008 with Dr. Deena Nardi, APN, CNP. (R. 336-337). Dr.

Nardi diagnosed Mr. Rogers with Major Depressive Disorder, mild, single episode and prescribed Paxil. (R. 337). Along with his antidepressant, the treatment regime consisted of anger management. (R. 336-337). Mr. Rogers resumed treatment September 23, 2009, the day after filing for benefits, complaining of frustration with his mother, who wanted him to provide full-time care for his incapacitated father, as well as anxiety. (R. 320, 325). On his October 27, 2009 visit, the report notes, "family [issues] persist with client[.] [I]n spite of the pain he is in, he manages to take care of his father and daughter." (R. 320).

The reports do not indicate any violence by Mr. Rogers, or any recommendations regarding his ability to work. (R. 318-327). It says that he needs to work on his "coping skills" and "id[entify] and cope with feelings of anger." (R. 316).

## C. The Administrative Hearing Testimony

### Mr. Rogers' Testimony

Mr. Rogers testified about his back pain and the difficulties he said it caused him in attempting to find work or perform tasks. However, his testimony seemed at odds with several of his medical reports.

Mr. Rogers thought he had looked for work sometime in 2009 but could provide no details or specifics when asked by the ALJ. (R. 54). Mr. Rogers believed his back pain began approximately eighteen months to two years before the hearing date of October 22, 2010. *Id.* He described the pain as "stabbing" that "just won't go away." (R. 55). Movement, remaining stationary, or sitting had no effect on the pain; it was constant. (R. 64). When the ALJ asked about pain intensity on a typical day, with 10 being "you would have to go to the emergency room," he immediately responded "10." *Id.* Later, when prompted by his attorney who advised

that "[o]bviously, it's not always a 10 because you'd live in the emergency room in that were the case," Mr. Rogers then rated his pain intensity as "7." (R. 64).

He testified his physician advised him that nothing could be done for the pain except taking Tylenol or Aleve, which he does every eight hours. (R. 55). That testimony was at odds with Dr. Hsu's recommendation that he get steroid injections. (R. 352). Mr. Rogers contended that his doctor did not recommend any medication or rehabilitation treatment, and he was not a good candidate for surgery because of his youth. (R. 56). That testimony was also at odds with Dr. Hsu's conclusion that he was not a candidate for surgery due to the nature of his complaints. (R. 352).

Mr. Rogers estimated he needed to move or switch positions every ten minutes to stay comfortable. He said he could stand for twenty minutes before the pain began, walk for twenty minutes and sit maybe ten or fifteen minutes. (R. 56, 60). He then said if he's up and moving for more than two or three hours, it begins to "kill his back." (R. 63). Squatting or kneeling also caused severe back pain. (R. 68). Lifting more than five or ten pounds also caused "really bad" pain in his low back. (R. 65). When describing a typical day Mr. Rogers stated that he wakes up, eats breakfast, and takes care of his incapacitated father, who has both Parkinson's and Alzheimer's. (R. 59). He feeds him, dresses him, and provides care twenty-four hours a day, while also caring for his daughter as well. *Id.* Later, Mr. Rogers claimed he needed to stay in bed most of the day three or four days per month, due to back pain. (R. 66).

Mr. Rogers testified he went shopping for an hour or so every couple of weeks, drove his daughter to school every day and took his father to doctor's appointments. (R. 58, 59). He also takes out the garbage, does his own laundry, cares for himself, and goes to the movies three or four times a month. *Id.* He also goes to the bowling alley to watch his friends bowl. (R. 58).

6

The ALJ asked if he was seeing a doctor regularly, and Mr. Rogers said just his heart and diabetes doctors, but, later added he thought he saw his orthopedic doctor every couple of months. (R. 60, 65).

Mr. Rogers testified he would occasionally get dizzy or light-headed when his diabetes was not properly controlled. (R. 62). This occurred, "[o]nce in a blue moon." *Id.* After his attorney asked him, he agreed he had difficulty concentrating because of his back pain, especially when caring for his father and would take Aleve or use an IcyHot patch and lay down to alleviate the discomfort. (R. 67-68).

He denied any difficulties with depression. (R. 63). He complained of no heart ailments once he began taking medication. (R. 66). Mr. Rogers stated he only slept three or four hours per night and needed one or two hour naps during the day, but never felt completely refreshed. (R. 69). However, sometimes he did sleep the whole night. *Id.*

### The Vocational Expert's Testimony

The vocational expert, Ms. Julie Bose, testified that Mr. Rogers' past work as a detailer/porter was rated as a medium position by the Dictionary of Occupational Titles, with an SVP: 2, unskilled. (R. 70). His next job as a janitor was rated as a medium position, again with a SVP: 2, unskilled. (R. 70). His job as a van driver was also a medium position, with an SVP: 3, low-end of semi-skilled. (R. 70-71). Mr. Rogers classified all work performed as "heavy" while it was generally classified as medium. *Id.*

Ms. Bose testified that a person with Mr. Rogers' age, education, and work experience who could only lift a maximum of ten pounds, and was limited to sitting fifteen minutes at a time, standing twenty minutes, and walking twenty minutes, and who could not kneel or squat, could not perform the past work performed by Mr. Rogers as it is customarily performed. (R.

71).  If a person could sit for four hours in a workday, stand, or move for four hours and lift up to ten pounds, these restrictions would permit sedentary, unskilled work and she provided three job examples.  (R. 71, 72).

During cross-examination by Mr. Rogers' attorney, Ms. Bose testified that a person in such a position requiring three to four days off work due to unscheduled treatment would eliminate all available positions.  (R. 73).  A new employee could have at most ten to fourteen absences in a year.  (R. 73-74).  Upon further questioning, Ms. Bose stated a loss of concentration during the workday of 34-66% would rule out the listed jobs.  (R. 74).

### III.  THE ALJ'S DECISION

The ALJ found that Mr. Rogers met the insured status requirements of the Social Security Act through Dec. 31, 2013 and that he had not engaged in substantial gainful activity since Oct. 1, 2008, the alleged onset disability date.  (R. 13).  He found five severe impairments:  (1) degenerative disc disease at L3-L5, (2) L4 vertebral body deformity, (3) hypertension, (4) history of heart attack, and (5) diabetes mellitus.  (R. 13).  The ALJ found that these impairments limited Mr. Rogers' ability to perform the full range of basic work activities and were severe, within the meaning of the Regulations.  (R. 13).

The ALJ also considered Mr. Rogers' benign renal cyst, benign adrenal gland cyst, obesity, and asthma and determined they had minimal effect on his ability to work and were non-severe.  (R. 14).  Regarding the renal and adrenal gland cysts, the ALJ considered the report by Mr. Rogers' nephrologist, Dr. Mohammad Shafi, that the cysts showed the characteristics of being benign, did not interfere with Mr. Roger's renal functions, and recommended no further intervention.  (R. 14).  The lack of necessary treatment further supported the ALJ's opinion that they were non-severe.  (R. 14).

Concerning Mr. Rogers' asthma, the ALJ noted that he takes medication on a needed basis, required no hospitalizations or immediate care for his asthma, and had no complaints regarding his condition. (R. 14). With regard to Mr. Rogers' depression, the ALJ found his medically determinable mental impairment caused only a minimal limitation in his ability to perform basic mental work activities and was non-severe. (R. 14). The ALJ considered the four broad functional areas set out in disability regulations for evaluating mental disorders in section 12.00C of the listing of impairments. (R. 14).

The first functional area is activities of daily living. The ALJ found Mr. Rogers had no limitation. (R. 14). The ALJ noted that Mr. Rogers was able to care for his very sick father, who required round-the-clock attention due to Parkinson's and Alzheimer's, while also providing food and shelter for his daughter, dropping and picking her up from school, going shopping, doing laundry, and cleaning the house. (R. 14). Mr. Rogers enjoyed recreational activities of watching his friends bowl and going to the movies three to four times per month. (R. 14). He has looked for employment without success. (R. 14). Mr. Rogers engages in extensive activities of daily living that support no limitation in the first functional area, the ALJ found. (R. 14).

In the second functional area, social functioning, the ALJ determined that Mr. Rogers had a mild limitation. (R. 14). He watched friends bowl, went to the park or band practice with his daughter, went to the movies weekly, and occasionally went out to eat. (R. 14).

The third functional area is concentration, persistence, and pace, and the ALJ found only a mild limitation for Mr. Rogers. (R. 15). The ALJ noted Mr. Rogers completes job applications online and helps his daughter with her homework. (R. 15). He watches television with no problems but did report issues with concentration when caring for his father. (R. 15). A documented occurrence of decreased concentration in November 2009 is noted by the ALJ in the

record, but no documentation of ongoing complaints or problems exist. (R. 15). The ALJ found no objective problems that would interfere with Mr. Rogers' responsibilities on a frequent basis. (R. 15). His overall extensive activities and use of Paxil to help with depression were used by the ALJ to support his "mild" finding for this area. (R. 15).

The fourth functional area is decompensation, and the ALJ found no extended episodes of decompensation. (R. 15). The ALJ noted that Mr. Rogers had done well on his medications without any serious, ongoing problems except nausea, when he switched from Paxil to Prozac in January 2010. (R. 15). The ALJ remarked that a diagnosis of depressive disorder, mild, single episode had been made for Mr. Rogers, but that in March 2008 his counselor indicated Mr. Rogers was psychiatrically stable and could participate in vocational evaluation, community based assessments, job training, job placement, and employment on a full-time basis. (R. 15). The ALJ took note of Mr. Rogers' increased feelings of depression in 2009 due to his father's failing health, but significantly, his diagnosis remained constant and positive. (R. 15). Mr. Rogers also made no complaints regarding his depression. (R. 15).

Because the first three functional areas have no more than a "mild" limitation with "no" episodes of decompensation for an extended period of time, the ALJ determined Mr. Rogers' depression was non-severe. (R. 15).

The ALJ found neither Mr. Rogers' obesity alone, nor in conjunction with any other impairment, gave rise to a listing level of severe. (R. 16). The ALJ noted that the consideration of obesity requires determining whether Mr. Rogers had a medically determinable impairment that was severe, if those impairments meet or equal any listing, and determining the residual functional capacity. (R. 16). Obesity also required determining what effect, if any, the condition

10

has upon the other impairments and Mr. Rogers' residual functional capacity. (R. 16). The ALJ also stated, "I have considered any additional and cumulative effects of obesity." (R. 16).

At the hearing, Mr. Rogers testified that he was 67 inches tall weighing 236 pounds. (R. 16). He is considered obese with a Body Mass Index ("BMI") of around 37. (R. 16). However, the ALJ took note that Mr. Rogers ambulates effectively without the use of an assistive device and only used over-the-counter treatments for his pain. (R. 16). The ALJ found no indication that Mr. Rogers' obesity, alone, or in conjunction with his other impairments, gave rise to a listing level severity. The ALJ gave Mr. Rogers the opportunity to convey additional complaints during his testimony, and the only assertion made was regarding his back pain, rather than from other non-severe impairments. (R. 16).

Next, the ALJ found that Mr. Rogers does not have an impairment or combination of impairments that meets or medically equals the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. In so doing, he looked to the opinions of the state medical consultants and the opinions and reports of Mr. Rogers' treating physician. None identified findings equivalent in severity to the specific criteria of the Listings, nor did the evidence itself show medical findings that are the same or equivalent to a listed impairment. (R.16).

The ALJ then found that Mr. Rogers has the residual functional capacity to perform the full range of medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c). He said that in making this determination, he considered, as is required by the Social Security Regulations, all symptoms and whether they were "reasonably consistent with the objective medical evidence," as is required by Social Security regulations. (R. 17). *See* 20 C.F.R. §§ 404.1527, 416.927 and SSR 96–2p, 96–5p, 96–6p, 06–3p.

After summarizing Mr. Rogers' testimony about his symptoms, the ALJ improperly trotted out the forbidden backwards reasoning formula: "the medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 19). The ALJ went on, however, to properly review the evidence.

He found that Mr. Rogers' treatment and medications were not consistent with his allegations of extreme pain and functional limitations. (R. 21). Mr. Rogers testified that his doctors had not prescribed any pain medications and indicated rehabilitative services would not help. (R. 20). However, the record showed that his doctors had in fact recommended that Mr. Rogers try Vicodin or Ultram, as well as six to eight weeks of physical therapy. *Id.* Mr. Rogers, the ALJ noted, only takes over-the-counter medications, which suggests that his pain is not as severe as indicated. (R. 20). Although Mr. Rogers testified he could not lift more than five to ten pounds, he reported in his adult function report being able to lift ten to twenty pounds. (R. 21). "These inconsistencies [the ALJ quite properly concluded] undermine the claimant's credibility." (R.20).

The ALJ found further support for his adverse credibility determination and his finding that that Mr. Rogers' allegations were exaggerated when he looked to Mr. Rogers' "extensive activities." *Id.* He was able to shop, clean, look for work, drive, help his daughter with her homework, and care for his ailing father on a daily basis. *Id.* He frequently went out to movies, went to watch friends bowl, to dinner, or to the mall. *Id.* These activities the ALJ found belied his claims of severe, throttling pain while standing, sitting, or walking. (R. 20-21).

The ALJ found significant Mr. Rogers' lack of follow-up treatment for his claimed pain. This, he concluded, further supported his determination that Mr. Rogers was only partially credible. After his first visit to his orthopedic surgeon in August 2009, Mr. Rogers did not follow through with the suggested treatment. He went again in January 2010, but presented no evidence of further treatment after January 2010 or of any follow through with the treatment recommended at that visit as well. (R.21). There was no explanation that would have accounted for this and it contrasted significantly with his frequent visits to his various other doctors for his other medical conditions.

The ALJ gave less than full weight to the capacity assessment of Dr. Hsu because he thought it based on the plaintiff's subjective complaints and inconsistent with Dr. Hsu's objective findings, as well as the foregoing evidence, which bore significantly on plaintiff's credibility. (R. 21). The ALJ gave significant weight to the opinions of the state agency expert consultants, which were consistent with the medical record that shows that the plaintiff could perform work at a medium exertional level. *Id.* Dr. Panepinto concluded that Mr. Rogers' impairments, diagnostic findings, and physical examination did not support the severe limitations he alleged. *Id.* The ALJ also gave considerable weight to the report of Dr. Richard Bilinsky, who noted on a follow-up treatment in March 2010 that the prior assessment of medium work remained unaltered. *Id.*

Finally, the ALJ considered any residual problems associated with a motor vehicle accident Mr. Rogers was involved in and residual limitations from a skull fracture he suffered. *Id.* The ALJ found no neurological findings to support any problems that Mr. Rogers had indicated in his functional report, as all examinations have shown he was alert and oriented times three. *Id.* His motor and sensory functions were normal and symmetrical. *Id.*

The ALJ concluded that Mr. Rogers was capable of performing his past work as a detailer/porter, janitor, and van driver, as these jobs did not require performance of duties outside of Mr. Rogers' residual functional capacity. (R. 22). The ALJ determined that Mr. Rogers had not been under a disability and thus was not entitled to DIB. *Id.*

## IV. ANALYSIS

### A. The Standard of Review

We review the ALJ's decision directly, but we do so deferentially, *Weatherbee v. Astrue*, 649 F.3d 565, 568–69 (7th Cir. 2011), and play an "extremely limited" role. *Simila v. Astrue*, 573 F.3d 503, 513–514 (7th Cir. 2009); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). "We do not actually review whether [the plaintiff] is disabled, but whether the Secretary's finding of not disabled is supported by substantial evidence." *Lee v. Sullivan*, 988 F.2d 789, 792 (7th Cir. 1993). *See also Weatherbee*, 649 F.3d at 568–69. If it is, the court must affirm the decision. 42 U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir.2010).

The court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Weatherbee*, 649 F.3d at 568–69; *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Where conflicting evidence would allow reasonable minds to differ as to whether the plaintiff is disabled, it is the ALJ's responsibility to resolve those conflicts. *Simila*, 573 F.3d at 513–514; *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Since conclusions of law are not entitled to such deference, where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot "rubber stamp" the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Although the ALJ need not address every piece of evidence, he cannot limit discussion to only that evidence that supports his conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the plaintiff a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The ALJ must therefore build a "logical bridge" between the evidence and the ALJ's conclusion. *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). It is a "lax" standard. *Berger*, 516 F.3d at 545. It is enough if the ALJ "'minimally articulate[s] his or her justification for rejecting or accepting specific evidence of a disability.'" *Berger*, 516 F.3d at 545; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). *Accord Olsen v. Colvin*, _Fed.Appx._. 2014 WL 185378, 7 (7th Cir. 2014); *Filus v. Astrue*, 694 F.3d 863, 869 (7th Cir. 2012).

### B. The Five-Step Sequential Analysis

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

> 1) is the plaintiff currently unemployed;
> 2) does the plaintiff have a severe impairment;
> 3) does the plaintiff have an impairment that meets or equals one of the impairments
>    listed as disabling in the Commissioner's regulations;
> 4) is the plaintiff unable to perform his past relevant work; and
> 5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. § 404.1520; *Simila*, 573 F.3d at 512–13; *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351–52 (7th Cir.2005).

An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the plaintiff is disabled. 20 C.F.R. § 416.920; *Briscoe*, 425 F.3d at 352. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the plaintiff is not

disabled. 20 C.F.R. § 404.1520; *Stein v. Sullivan*, 892 F.2d 43, 44 (7th Cir. 1989). The plaintiff bears the burden of proof through step four; if it is met, the burden shifts at step five to the Commissioner, who must present evidence establishing that the plaintiff possesses the residual functional capacity to perform work that exists in a significant quantity in the national economy. *Weatherbee*, 649 F.3d at 569–70; *Briscoe*, 425 F.3d at 352.

## C. Analysis

Mr. Rogers makes four arguments for reversal: The ALJ improperly weighed the medical opinion evidence; failed to consider his obesity; made an improper and vague credibility decision regarding his testimony; and the ALJ's decision was not supported by substantial evidence. None of Mr. Rogers' arguments are persuasive.

### 1. The ALJ Properly Weighed The Medical Evidence.

Mr. Rogers' first contention is that the ALJ failed to give sufficient weight to his treating physician, Dr. Hsu, and instead gave considerable weight to the physicians for the state agency, Drs. Panepinto and Bilinsky, neither of whom specialized in orthopedic medicine or examined or treated Mr. Rogers.

A treating physician's opinion is entitled to controlling weight when "well-supported by medically acceptable clinical and laboratory diagnostic techniques and...consistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(d)(2); *Schmidt*, 496 F.3d at 842; *White v. Barnhart*, 415 F.3d 654, 658 (7th Cir. 2005). However, if contradicted by well-supported evidence, the administrative law judge need not give the treating physician's opinion controlling weight. *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir.2006). At that point, "the treating physician's evidence is just one more piece of evidence for the administrative law judge to

weigh." *Id.* at 377. *See* the extensive discussion in *Campbell v. Astrue*, 627 F.3d 299, 308-309 (7th Cir. 2010).

The ALJ considers various factors when deciding how much weight to give a treating physician's opinion, including how often the treating physician has examined the claimant, whether the physician is a specialist in the condition claimed to be disabling, consistency with the record and other relevant factors. *Id.*; 20 C.F.R. § 404.1527(d); *Scott v. Astrue*, 647 F.3d 734, 739–40 (7th Cir. 2011). But that treatment relationship and familiarity also can provide a potential for bias in favor of the patient. As the Seventh Circuit has explained, although a treating physician's opinion may be more informed because he has greater familiarity with the patient, having treated him over time, *Schmidt*, 496 F.3d at 842, the treating physician may "'bend over backwards to assist a patient in obtaining benefits,'" *Punzio v. Astrue*, 630 F.3d 704, 713 (7th Cir. 2011), and "too quickly find disability." *Dixon*, 270 F.3d at 1177. *See also Zeigler Coal Co. v. Office of Workers' Compensation Programs*, 490 F.3d 609, 616 (7th Cir. 2007).

"Simply because [his] physician states that he is 'disabled' or unable to work" does not automatically qualify a claimant for disability benefits. *Schmidt*, 496 F.3d at 842. A treating physician's opinion is "not the final word on a claimant's disability." *Id.* "The Commissioner, not a doctor selected by a patient to treat her, decides whether a claimant is disabled." *Dixon*, 270 F.3d at 1177. "[T]he [ALJ] decide[s] which doctor to believe—the treating physician who has experience and knowledge of the case, but may be biased, or ... the consulting physician, who may bring expertise and knowledge of similar cases." *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1992); *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985).

Here, the ALJ considered Dr. Hsu's February 2010 report for Disability Determination Services. (R. 343-346). Dr. Hsu based his report on only two visits by Mr. Rogers, one in

August 2009, and another in January 2010. The absence of extended treatment of a patient is a significant factor in according the weight to be given to the so-called treating doctor. Moreover, while Dr. Hsu's report notes abnormal gait, muscle spasms, and weakness, none of these conditions are mentioned in his treatment notes. Prior inconsistencies like these bear on credibility. *See Schmidt,* 496 F.3d at 842 ("An ALJ thus may discount a treating physician's medical opinion … when the treating physician's opinion is internally inconsistent").

Dr. Hsu specifically indicated Mr. Rogers' motor strength testing showed a 5/5 strength throughout his bilateral lower and upper extremity with a normal gait. (R. 21). He stated that Mr. Rogers suffered from constant low back pain with a "failure formation of the L4 vertebrae," but also noted that this did "not appear to be associated with his pain." (R. 343). When a physician's treatment notes contradict his opinion, the ALJ may use such an inconsistency in making a credibility determination. *Skarbek v. Astrue*, 390 F.3d 500, 503 (7th Cir. 2004). Indeed, the regulations allow the ALJ to make such a finding. *See Similia v. Astrue*, 573 F.3d 503, 516-17 (7th Cir. 2009).

Here, the ALJ determined the clinical findings and limited treatment "did not support the limitations assessed in the questionnaire," and were based on Mr. Rogers' subjective complaints rather than objective findings. *Id.* When a doctor's conclusions are based solely on a claimed symptom or subjective complaint from a patient, they may be, in appropriate circumstances, discounted. *White*, 415 F.3d at 659; *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004). Here is how the court phrased it in *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008):

> Substantial evidence supports the ALJ's decision to give greater weight to the state-agency doctors' opinions than to that of Ketelboeter's treating physician, Dr. Dickson. As the ALJ observed, the record contains scant objective evidence in support of the alleged severity of Ketelboeter's self-reported symptoms and accompanying pain and discomfort. For example, repeated x-rays showed no physical changes that might have corroborated

the claimed increase in pain that Ketelboeter reported over time. *See Skarbek,* 390 F.3d at 504 (upholding ALJ's decision to discount treating physician's finding that claimant had limited range of motion because it was not supported by x-rays or other medical evidence). Dr. Dickson's conclusions about Ketelboeter's limitations were based almost entirely on Ketelboeter's subjective complaints rather than objective evidence. His conclusion was also internally inconsistent: he believed Ketelboeter's reported pain was out of proportion with the physical evidence and objective evidence in the record, but nonetheless concluded that he was disabled.

550 F.3d at 625. *Accord Olsen v. Colvin*, _Fed.Appx._, 2014 WL 185378, 8 (7th Cir. 2014); *Givens v. Colvin*, _Fed.Appx._, 2013 WL 6623179, 6 (7th Cir. 2013).

Here, the ALJ discussed the discrepancies and inconsistencies between the findings recorded during treatment and the final determination. He did not simply arbitrarily or without explanation reject Dr. Hsu.

### 2. The Claimed Failure To Consider The Plaintiff's Obesity

Mr. Rogers next argues that the ALJ failed to consider his obesity -- he weighed 236 pounds and was sixty-seven inches tall, with a BMI of 37 (R. 16) -- in conjunction with his other severe and non-severe impairments when determining his RFC and that the only mention of his obesity was a vague and conclusory statement that the ALJ, "considered any additional and cumulative effects of obesity." (R. 16). The record belies this claim.

Generally, an ALJ must consider only impairments alleged by a claimant or about which he receives evidence. 20 C.F.R. § 404.1512(a). Of course, if the evidence of "another relevant impairment that could contribute to the cumulative effect of [a claimant's] other impairments" sufficiently alerts the ALJ, he must consider that effect as a whole. *Clifford v. Apfel*, 227 F.3d 863, 873 (7th Cir. 2000). And any error in failing to mention obesity is harmless if the claimant did not explain to the ALJ how his obesity aggravated his condition and rendered him disabled. *See Mueller v. Colvin*, 524 Fed.Appx. 282, 285-86 (7th Cir. 2013); *Prochaska v. Barnhart*, 454

F.3d 731, 737 (7th Cir. 2006); *Skarbek*, 390 F.3d at 504. Mr. Rogers' "mere assertion that he is obese did not satisfy that burden." *Mueller*, 524 F.Supp. at 285.

The record contains only a single mention of Mr. Rogers' obesity, in a report from February 2009, with only height and weight measurements on the remainder of the medical reports. (R. 261, 257-355). There is no mention in Dr. Hsu's reports that obesity played any role in Mr. Rogers' condition, which he thought was essentially a lumbar strain. The focus on Mr. Rogers' obesity and weight concerned controlling his diabetes and assisting his hypertension. In fact, in his examination report from August 2009, Dr. Hsu describes Mr. Rogers as a "well developed, well-nourished male in no acute distress." (R. 302). Neither Dr. Hsu nor any other physician mentioned obesity as limiting his ability to work or function in any way or accounted in any way for his claimed pain. *Compare Skarbek*, 390 F.3d at 504 ("although the ALJ did not explicitly consider Skarbek's obesity, it was factored indirectly into the ALJ's decision as part of the doctors' opinions."). *See also Hoyt v. Colvin*, _Fed.Appx._, 2014 WL 444161, 3 (7th Cir. 2014)(ALJ indirectly accounted for Hoyt's obesity by relying on the medical opinions of state-agency physicians who evaluated his height and weight).

A single mention of a claimant's obesity in a medical report with no supporting documentation of the effects on his ability to work will not suffice. The burden is upon the Social Security Disability claimant to provide evidence proving his claim of disability. *See Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006). Mr. Rogers has pointed to no evidence to show how his obesity has any effect on his ability to work, or how it impedes his daily activities. Since the ALJ adopted the limitations suggested by the reviewing physicians, and the claimant failed to present evidence of how his obesity impeded his ability to work, any failure by

the ALJ to have discussed further Mr. Rogers' obesity, even if error, is harmless. *See Prochaska*, 454 F.3d at 736-37.

Here, the ALJ considered the evidence presented by Mr. Rogers, stated that he factored his obesity into his decision, and concluded that Mr. Rogers was still not disabled. Mr. Rogers presented no evidence to the ALJ showing how obesity aggravated any condition. The argument that relies on obesity is baseless.

### 3. The ALJ's Credibility Decision

The ALJ's assessment of credibility is reviewed with "special deference" because the administrative law judge, and not the court, is in the best position to observe the claimant's testimony. *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir.2010); *Briscoe*, 425 F.3d at 354. Overturning a credibility assessment requires the ALJ's assessment to be "patently wrong," or "lack[ing] any explanation or support." *Jones v. Astrue,* 623 F.3d 1155,1160, 1162 (7th Cir.2010). Demonstrating a credibility assessment is "patently wrong" is a "high burden." *Turner v. Astrue,* 390 Fed. App'x 581, 587 (7th Cir.2010).

Mr. Rogers argues that the ALJ's credibility determination was improper for two reasons. First, the language used by the ALJ was "boilerplate" that failed to provide the clear and distinct reasons for discrediting Mr. Rogers' testimony. *Plaintiff's Memorandum* at 10. Second, Mr. Rogers argues that it was improper for the ALJ to discredit his credibility based on his ability to perform tasks at home, as these do not equate with his ability to work. *Id.* at 11. Mr. Rogers' arguments are unpersuasive.

### a.

The ALJ stated that "the Claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements

concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent" with the RFC finding. (R. 19). The Seventh Circuit has criticized this formula, explaining that it results in a "backwards" assessment. That is, instead of making the credibility assessment after the RFC determination, the ALJ puts the cart before the horse and makes credibility a function of the RFC determination. *See Bjornson v. Astrue*, 671 F.3d 640, 644-46 (7th Cir. 2012). Despite the Seventh Circuit's continued denunciation of the use of the talismanic phrase, *Pierce v.* Colvin, 739 F.3d 1046, 1050 (7th Cir. 2014), the ALJs, at least in this district, continue to use it.

And so predictably, one sees over and over the tired argument that the ALJ employed the boilerplate phrase and seeking reversal on that basis. The problem with this argument is that it completely ignores case after case that has clearly explained that what really matters is whether the ALJ gave reasons for finding the plaintiff not credible. *Ronning v. Colvin*, _F.3d_, _, 2014 WL 593675, 3 (7th Cir. 2014); *Pepper v. Colvin*, 712 F.3d 351, 368 (7th Cir. 2013); *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012); *Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012). The ALJ gave reasons here and, incredibly, Mr. Rogers even acknowledges *in the very next paragraph of his brief* that he did. (*Plaintiff's Brief*, at 11). If the mere use of "boilerplate" is toxic, not a single plaintiff's brief in Social Security disability cases would pass muster.

In this case, as in most cases, the ALJ did not actually engage in backwards reasoning, because the ultimate credibility assessment is based on the evidence, the evaluation of which appears in other portions of the opinion And that is all that is required. *See Colvin, supra; Richison v. Astrue*, 462 Fed. Appx. 622, 625-626 (7th Cir. 2012); *Punzio*, 630 F.3d at 709; *Parker*, 597 F.3d at 921–22. Here, the ALJ's exceedingly careful and explanatory assessment of the evidence spans almost five pages in the record. (R. 17-21).

It cannot be too often repeated or too strongly stressed that "of course, the Administrative Law Judge did not have to believe" Mr. Rogers, *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir 1996), or uncritically accept his testimony at face value. See *Moore v. Colvin*, 743 F.3d 1118, 1126 (7th Cir. 2014); *Simila*, 573 F.3d at 517 ("Despite the inherent difficulty of evaluating testimony about pain, an administrative law judge will often have solid grounds for disbelieving a claimant who testifies that she has continuous, agonizing pain."). *See also Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012). Under the Social Security Act, administrative law judges are not inert and wooden participants in an empty ritual, the preordained end of which is to award benefits to those in distress, regardless of whether they qualify under the Act. The purpose of a social security hearing is to enable the ALJ to determine where the truth lies and to administer the Act in conformity with Congress's carefully crafted statutory framework. In this case, the ALJ did exactly that. And he more than adequately explained his reasoning.

The ALJ noted that Mr. Rogers testified he had actively pursued work as a janitor, thereby demonstrating at least Mr. Rogers' belief that he is capable of performing this kind of work. (R. 19). In fact, Mr. Rogers was clear that he would still be employed in the school lunch delivery program at Laraway had they not lost the program that paid for him. (R. 19; 206). The ALJ was warranted in finding that this was some evidence that the Plaintiff at least believed he was capable of work, but was unsuccessful in finding it. (R. 20). More importantly, the ALJ also found that the symptoms Mr. Rogers complained of were not supported by the medical evidence and indeed were belied by it (R. 20).

At his initial appointment with Dr. Hsu in August 2009, the doctor noted that Mr. Rogers does not have a history of low back pain, although Mr. Rogers did complain of asthma, coronary artery disease, history of myocardial infarction, and that he had a pacemaker. His physical

examination showed that he was in no acute distress. His motor strength testing was normal, he had a normal gain, he could walk heel to toe and tandemly without difficulty. He had a negative straight leg raise test in the sitting and supine positions. While he had some evidence of disc space narrowing at L3-L4 and L4-L5, and a mild disc bulge at L1-L2 and L2-L3, there was no significant central canal stenosis or obvious neural foraminal narrowing. (R. 19).

Dr. Hsu concluded that the complaints of low back pain were likely muscular in nature and that Mr. Rogers should have six to eight weeks of physical therapy with strengthening exercise. *See supra* at 3-4. He instructed Mr. Rogers to follow up with him if his symptoms persist. The ALJ found it significant that Mr. Rogers sought treatment from Dr. Hsu on only one other occasion, and that was six months later in January 2010. The ALJ also noted that despite Mr. Rogers' claims of ongoing pain, he did not again seek treatment from Dr. Hsu after January 2010. (R. 18-20).

The ALJ contrasted this with the regularity with which Mr. Rogers regularly obtained medical care for his other conditions including depression, diabetes, heart problems, cholesterol and blood pressure (R. 18) – none of which, it should be noted, are claimed to be the source of Mr. Rogers' claimed disability in this case. This is definitely not a case, then, where the claimant had no access to medical treatment because of poverty or lack of insurance that might have precluded the claimant from seeing a doctor. *Compare Thomas v. Colvin*, 534 Fed.Appx. 546, 550 (7th Cir. 2013). Additionally, the ALJ found it significant that Mr. Rogers did not have any steroid injections, notwithstanding Dr. Hsu's recommendation. (R. 20). The ALJ found Mr. Rogers' omissions in this regard (i.e., his lack of further treatment) inconsistent with his claim of debilitating pain. (R. 20-21).

These conclusions were dictated by common sense and human experience and was perfectly consistent with long established precedent in this Circuit. It is beyond debate that ALJs can use a combination of "objective evidence and common sense" to evaluate whether alleged symptoms establish an inability to work. *Castile v. Astrue*, 617 F.3d 923, 930 (7th Cir. 2010). Both common sense and human experience teach that people in acute distress do something about it unless there is something that prevents action. Here, there was no such impediment. And yet, Mr. Rogers saw Dr. Hsu only twice and those visits were separated by a six month period. He never followed through on the doctor's recommendation that he get steroid injections or that he take pain medication only available by prescription. *See Simila*, 573 F.3d at 519; *Schmidt*, 496 F.3d at 843-44; *Dixon*, 270 F.3d at 1178–79 (ALJ could have reasonably determined that the claimant's testimony was not credible based in part on a finding that the claimant's visits to physicians were "intermittent at best").

The Seventh Circuit has been consistent in holding that "[i]n assessing credibility, infrequent treatment or failure to follow a treatment plan can support an adverse credibility finding where the claimant does not have a good reason for the failure or infrequency of treatment." *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir.2008). *See also Hoyt*, 2014 WL 444161, 3. Similarly, the Social Security regulations permit the ALJ to consider a claimant's treatment history, and failure to seek medical attention or follow a pain management regimen.

The ALJ noted in his opinion the inconsistency between Mr. Rogers' testimony and his doctor's treatment recommendations. Mr. Rogers testified, in response to a question from the ALJ, that his doctors had not prescribed further treatment and that they did not believe rehabilitative treatment would help. Nor had they prescribed any pain medication. (R. 20, 56). However, as the ALJ pointed out in his thorough opinion, the record shows that his physician

had recommended a pain management course of treatment along with six to eight weeks of rehabilitative care. (R. 20). This evidence is doubly significant. First, it impeaches Mr. Rogers and second, it permitted the ALJ to reasonably conclude that since there were no legitimate explanations to account for Mr. Rogers' failure to follow through on his doctor's recommendations Mr. Rogers was exaggerating his level of distress. *See Craft*, 539 F.3d at 679.

The record makes clear that this is not a case in which an ALJ simply brushed off complaints of pain. *See* R. 21. That would be improper. *See, e.g., Pierce v. Colvin*, 739 F.3d 1046, 1049-50 (7th Cir. 2014)(an ALJ cannot ignore complaints of pain solely because they were unsupported by significant physical and diagnostic examination result). But that does not mean that the absence of medical evidence doesn't count. It does. *See Moore*, 743 F.3d at 1126. This is a case in which the evidence contradicted Mr. Rogers' claims of pain and showed them to be highly exaggerated.

The ALJ also noted that the physical examinations were mostly within normal limits, and other tests on Mr. Rogers were negative. (R. 21). "Although an ALJ may not ignore a claimant's subjective reports of pain simply because they are not supported by the medical evidence, discrepancies between the objective evidence and self-reports may suggest symptom exaggeration." *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010)("the objective medical evidence consistently revealed only mild degenerative change, and the ALJ properly relied upon the discrepancy between the objective evidence and Jones's self-reports."); *Hoyt*, 2014 WL 444161, 3. Indeed, it is in such cases that the credibility of the claimant "becomes pivotal." *Pierce*, 739 F.3d at 1050. *See also Sienkiewicz v. Barnhart,* 409 F.3d 798, 804 (7th Cir. 2005).

In sum, the ALJ provided substantial reasoning for his credibility assessment of Mr. Rogers. Mr. Rogers' objection to that credibility determination as "boilerplate" simply ignores

the record.  In this case, it cannot be said that the ALJ's assessment of Mr. Rogers' credibility was "patently wrong." *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013). It must be remembered that the standard of review employed for credibility determinations is "extremely deferential."  *Id.*  Here, as is required, "the ALJ did provide some evidence supporting [his] determination."  *Id.*

### b.  The Activities of Daily Living

Mr. Rogers next argues that the ALJ's credibility determination was faulty because it was based on his testimony regarding his daily activities and the ALJ equated Mr. Rogers' household work to work in the labor market.  He contends the ALJ "failed to recognize the difference between Mr. Rogers' activities of daily living and his ability…to perform in [the workplace]." *Plaintiff's Memorandum* at 12. The argument, which has become a staple of Social Security appeals, is unpersuasive.

In making judgments about the veracity of a claimant's statements about his or her symptoms, including pain, Social Security regulations require the ALJ, in addition to considering the objective medical evidence, to consider the following in totality: (1) *the claimant's daily activities*; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effect of any medication that the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the claimant uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. §404.1529(c)(3) (emphasis added).  *See Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006).

There are, it is true, significant differences between the activities of daily living and the requirements of a full-time job. *See Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012). A person has far more flexibility in the timing of performance of daily activities than in performing the duties of a job and is not held "to a minimum standard." *Id.* However, the ALJ "is allowed to consider whether the claimant's activities are inconsistent with [his] stated inability to work." *Oakes v. Astrue*, 258 Fed. Appx. 38, 43 (7th Cir. 2007). But the ALJ "must explain perceived inconsistencies between a claimant's activities and the medical evidence." *Jelinek v. Astrue,* 662 F.3d 805, 812 (7th Cir.2011). *See also Schreiber v. Colvin*, 519 Fed. Appx. 951, 960 (7th Cir. 2013)(finding ALJ's decision appropriate where undue weight was not placed upon daily activities and valid reasons existed for the credibility determination).

Mr. Rogers cites *Mendez* and *Gentle v. Barnhart*, 430 F.3d 865 (7th Cir. 2004) to support his position that the ALJ gave excessive weight to Plaintiff's daily living activities. *Mendez* concerned the daily activities of a twenty-two year old developmentally disabled individual with an IQ of between 68 and 71 with severe bouts of depression and anxiety requiring anti-psychotic medication. *Mendez*, 439 F.3d at 360. The ALJ failed to consider all of the claimant's impairments and concluded that because she was able to perform daily activities in caring for four children, she could work. *Id.* at 362-363.

In the instant case, the ALJ did not commit the twin errors of excessive over reliance on daily activities and of ignoring evidence that troubled the Court in *Mendez*. After reviewing the "extensive activities" in which Mr. Rogers regularly engages, including going to movies several times a month, to dinner often, to the park or band practice with his daughter, shopping, lawn work, and traveling to watch his friends bowl, etc.. (R. 14). He also looks for employment, which is at least an indication he believes he has the capacity to work. *Id. see infra* at 29 the ALJ

concluded that "these activities undermine the claimant's severe allegations of pain and problems with sitting, standing, or walking." (R. 20). The ALJ noted that Mr. Rogers cared for his ailing father on a full time basis, engaged in activities' with his daughter outside the house, and went on to discuss his extensive recreational activities, which, at least to some extent, were inconsistent with his "severe allegations of pain and problems with sitting, standing, or walking." (R. 20). These activities were properly considered. *Olsen v. Colvin*, _Fed.Appx._, 2014 WL 185378, 6 (7th Cir. 2014)(ALJ correctly compared claimant's daily activities (which included cooking, reading, shopping for groceries, watching television, and vacuuming) to her testimony that she has a very limited ability to sit, stand, and walk). In the instant case, the ALJ properly "explain[ed] inconsistencies between [the] claimant's activities and the medical evidence," *Jelenik*, 662 F.3d at 812.

Judge Posner has suggested that, unless a claimant alleges that he is in constant, excruciating, and unrelenting pain, the fact that he can engage in a few activities does not undermine his credibility. *Carradine v. Barnhart*, 360 F.3d 751, 755-56 (7th Cir. 2004). Mr. Rogers, it will be recalled, testified that his pain was at a constant level of 10 - -which would have meant, under the definition given by the Administrative Law Judge, that he needs emergency treatment all the time. (R. 64). It was not until his lawyer cued him on his examination that he changed his testimony to say that it was at a level of 7. In fact, he said he needed to stay in bed most of the day three or four days per month, due to back pain. (R. 66). The ALJ was certainly warranted in concluding that Mr. Rogers was exaggerating his pain

Unlike, *Gentle,* where the facts concerned a mother caring for an infant, the activities cited by the ALJ in this case include both required activities, such as caring for his father, and recreational activities. (R. 20); *Gentle*, 430 F.3d at 866-67. Mr. Rogers goes to movies several

times a month, to dinner often, to the park or band practice with his daughter, goes shopping, does lawn work, and travels to watch his friends bowl. (R. 14). He also looks for employment, which is at least an indication he believes he has the capacity to work. *Id.* And that, the ALJ could find, is inconsistent with the claims of a man who insists that he has constant and debilitating pain, that he spends several days a week in bed, and who claims his pain is constant. The recreational activities cited by the ALJ go beyond the facts of *Gentle. See Gentle*, 430 F.3d at 866-67.

But the ALJ's opinion makes clear that his decision was not bottomed on the extent of Mr. Rogers' activities. As discussed above, he looked to Mr. Rogers' inconsistent testimony, his at best intermittent efforts to see Dr. Hsu, his failure to follow Dr. Hsu's recommendations, his never having to obtain prescribed pain medication or the extended physical therapy urged by Dr. Hsu. (R. 20). On this record, it cannot be said that the ALJ's credibility determination is "patently wrong."

### 4. The ALJ's Decision Was Supported By Substantial Evidence

Finally, Mr. Rogers contends that the ALJ's decision was not supported by substantial evidence. What we have said above shows the argument to be without merit.

### CONCLUSION

The plaintiff's motion for summary judgment or remand is DENIED, and the Commissioner's motion for summary judgment is GRANTED.

_____
Jeffrey Cole
United States Magistrate Judge

DATE: April 24, 2014

30